## Hatfield Township School District Auditors' Petition.

Argued April 22, 1947.  Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Guy S. Claire,* for appellant.

*Victor J. Roberts,* with him *High, Swartz, Flynn & Roberts,* for appellees.

OPINION BY ARNOLD, J., September 30, 1947:

This appeal is from an order of the court below directing the officers, directors and supervising principal of the Hatfield Joint Consolidated School District to comply with a duces tecum subpœna issued by the official auditors calling for the production of various books, vouchers and papers.

The Hatfield Joint Consolidated School District was formed by the school districts of the borough of Hatfield and the township of Hatfield. Its bank account is carried by its treasurer in the Hatfield National Bank under the name, "Hatfield Joint Consolidated School District," hereafter called the "official account." The warrants or vouchers thereon are executed by the proper officers of the district.

In the same bank is an account called "Hatfield Joint School Accounts," and the sole right to withdraw funds therefrom is possessed by Elmer B. Laudenslager, the supervising principal. This we will refer to as the "activities account." The appellants challenge the right of the statutory auditors to examine this account.

Prior to 1936 money raised by various classes, athletic and school activities had been banked separately with an account for each particular activity, including the athletic association. This resulted in a considerable number of separate bank accounts, all of which bore some relationship to the high school.

In 1936 the board of the consolidated school passed a resolution that the activity and the athletic association accounts be consolidated "under the supervision of the supervising principal *and the control of the school board* . . ., and [that] the account be audited annually." (Emphasis supplied.) A later resolution pro-

vided that money raised by any class, or through the school, must be used for a class memorial, or a trip to Washington; and any balance be given to the alumni association, the library, or other school activity. By resolution the supervising principal and the treasurer were to sign the vouchers. Later, with the acquiescence of the board, withdrawals were had on the signature of the supervising principal only. In 1937 by resolution all student class funds prior to 1936 were appropriated to the general fund of the consolidated school. A similar resolution confiscated other class monies.

The system thus initiated continued, and into this one activities account, the sole power over which was in the supervising principal (although presumably he was subject to the direction of the board), went monies derived from athletics, dramatics, the school paper, the school annual, various manual training shop activities, and a number of other similar enterprises.

For the fiscal year 1943-44 there passed into this account over $13,000; for the year 1944-45, over $16,000.

The supervising principal kept a ledger which purported to show that these monies were divided into some twenty-six accounts, each of which was "an activity." In 1943-44 the bank balance, thus on paper divided among the various activities, was over $4,000; and for 1944-45, over $4,500.

In addition to this checking account there was carried in the same bank a savings account, in excess of $1800 and also under the sole control of the supervising principal. This savings account, too, was divided on the ledger of the supervising principal into six accounts: Hatfield Joint School; Library; Farmcraft; Miscellaneous Department; Athletic Association; Orange and Black (school publication).

Both the checking and the savings accounts created from these activities were "audited" only by two members of the school board appointed by the president, and their so-called audit was offered in evidence. It did not

show the sources of the deposits but merely the gross deposits of $11,411.06 during the fiscal year 1943-44. It did not show the items withdrawn nor to whom paid, but merely the aggregate checks which were in excess of $9,400. In the year 1944-45 the checks paid were in excess of $12,600.

In the ledger of the supervising principal was a "miscellaneous general account," a "miscellaneous tuition account" and a "miscellaneous book account," and each showed a balance in varying amounts. These admittedly were funds of the school district derived from taxes, and by the school district paid into the activities account, and used as a petty cash account of the consolidated school district, known colloquially as an "In and Out Account." Thus from the activities account were paid items of general expense of the school district, such as janitor's salary, school supplies and fuel.

The appellant concedes that these three accounts are subject to official audit, but contends that the school district need only show, (a) the vouchers from the district to the activities account, (b) proper vouchers from the activities account for proper expenditures, and (c) the balance on hand. But on this phase the whole account is subject to audit, and not the particular items sought to be segregated. Apparently the activities account carried by the supervising principal is treated by the appellant as creating a debtor-creditor relationship between the some twenty-six activities (including the school district itself) and the supervising principal, and that the "debt" owed the school district is to be audited by merely an inspection of the ledger balance. But to determine whether there are sufficient funds to pay these three "creditor" activities the balances thus shown on the ledger, there must be a determination of whether sufficient funds are on hand to pay the other twenty-three; otherwise if there is a shortage so that all may not be paid, there would be no way of determining where the shortage should fall. But the super-

vising principal is not a licensed private banker, though he is acting as if he were. The funds of the district rather are trust funds in his hands, which he and the board have intentionally intermingled with other funds. This carries the whole intermingled fund into audit, for the activities account is subject to check for other purposes than that of the school district. This is an illegal device and contrary to the School Code. It is also subject to official audit to safeguard the public funds. The activity account concerned in this appeal is subject to audit for another reason: The monies are under the control of the district, acting through its directors. It determines what may be done with funds derived from these class activities. It determines what bills shall be paid from the funds derived from activities such as athletics, school publications and dramatics. While the checks or vouchers are manually executed by the supervising principal, they are in fact issued by the board through him as its agent. They are therefore subject to an official audit, for §2601 of the School Code of 1911 (24 PS 2201) provides: "The finances of every school district . . ., in every department thereof, *together with* the accounts of all school treasurers, school depositories, . . . directors' association funds, sinking-funds, and other funds *belonging to or controlled by* the district, shall be properly audited. . . ." (Emphasis supplied.)

Appellants also allege in this case that the duces tecum subpœna was invalid because it summoned each of them (who were in fact officers of the consolidated district) to bring with them the papers and records of the school district *of the township,* and did not require the records of the consolidated district. But when the appellants appeared before the auditors, in obedience to the subpœna (and this they were bound to do regardless of the duces tecum clause) they did not refuse to produce the papers of the consolidated school district because they had not been called for by the duces tecum

clause. Instead they stated that they *had* brought with them the documents of the consolidated school, but that they refused to give them up to the auditors. The reason now alleged as an excuse for disobeying the subpoena is not the reason on which they stood.

Appellants have asked us to determine whether the activities account is subject to official audit even though no tax monies were in it, and state: "This question is a matter of interest to every district in the Commonwealth. The decision in this case will affect every school district . . . [and] . . . will decide once and for all the status of such funds . . . even as the legislature established the status of the cafeteria funds [§8 of Act of 1931, P. L. 243, and Act of 1945, P. L. 688, (24 PS 331)]."[1] Indeed the evidence in this case disclosed four other nearby communities operating a similar system, and in fact the system is widespread. It is fraught with great danger. High school football and other athletics have achieved great popularity, and this means that almost any school district, depending in a degree upon the skill of the athletes, has athletic events the admission fees of which aggregate a large sum of money, probably in excess of $10,000. It would be a great blow to the public school system if, by embezzlement or lack of care, such funds should be lost. Not only has the school board a moral duty to perform but there is also a legislative imperative. The public school system of this commonwealth is entirely statutory. Within the constitutional limitations the legislature is supreme, and there reposes in the courts no power to permit deviation from its commands; and neither the local school districts nor the State Department of Education may by-pass the duties enjoined.

In the so-called activity accounts various situations obtain. Of course, if pupils of a class give money to a

---

[1] By the School Code of 1911, §2514, 24 PS 2173, library accounts are also subject to official audit.

supervising principal to purchase for them class jewelry or similar things, the school district has no official duty (although it may have a moral duty), for the supervising principal acts as agent of the pupils. This is the smaller end of the problem. At the other pole, a school district, acting under the express provisions of §405 of the Code, 24 PS 339, has athletic events. These activities produce large sums of money from paid admissions. Under the instant system these sums of money are not disbursed through the treasurer, nor through a resolution of the board, but are solely at the command of one individual, who has no statutory standing or duty. It is possible that some school district may neither *directly* nor *indirectly* furnish any money for the playing field or stadium; or for the coaching of the athletes, or for their uniforms or playing togs, or for the apparatus with which the sport is connected, or for the lighting of the field; although it is very doubtful whether such case exists. But it is certainly true that, if a school district operates and expends tax money for the acquisition, maintenance or lighting of the playing field, or for the payment of services of a coach, the admissions charged result from the use of public property and from the expenditure of tax monies and are the property of the school district, must go into the official account of the treasurer thereof, and are subject to audit.

The monies derived from the sale of admissions to witness the event in question come into being because of (1) the use and wear of the school building and grounds; (2) the use and wear of personal property owned by the district; (3) the payment to employes such as coaches for their services; (4) the payment by the district for light, heat and various maintenance charges, including janitor service. By reason of the use of these public funds the event takes place, and from it are reaped the admission fees paid to witness the performance. The pupils are not expected to and do not furnish any of the money. The admission fees could not belong to

396

them, and indeed if taken they would be professionals instead of amateurs. The spectators are not to get their money back. No one has any investment except the school district. The money raised by admissions therefore belongs to the district, which by its property and funds made the admission fees possible.

Of lesser importance, but in the same category, are the admission fees charged for dramatic and musical enterprises held in the buildings of the district. These belong to the district for the same reasons and with the same results. For instance, the school districts usually and properly provide musical instruments, just as they provide equipment and uniforms for athletics. In the instant case admission fees were expended through the activities account for such instruments, but it was frankly admitted that when bought the instruments belonged to the district. So do the admission fees themselves.

We have not attempted to discuss each situation that may present itself, but where monies or property are derived directly or indirectly through the use of school buildings, or from the expenditure of public funds of the district, the monies thus derived are public property, must be handled exactly as tax monies and be paid to the district treasurer.

We have some difficulty in understanding why it is desirable to have this system, which is alleged to be general in the state, and thus handle these funds separate and apart from the general funds of the district. It is said that it is a convenience, although of course convenience cannot override the legislative mandate that the funds must be handled by the treasurer. There would seem to be no greater inconvenience in placing these funds with the school treasurer and having the same sort of ledger accounts opened as are exhibited in this system; or separate bank accounts could be opened by the treasurer for the athletic or other activities of the school district. If the purpose is to encourage the

activities to be self-supporting; or to discourage the excessive use of tax monies to promote activities;—the same result can also be accomplished by this method. Certain it is that the statute never contemplated that large sums of money thus coming in through the use of the school property and appropriations should pass into the hands of those who are not officials and have no public or official responsibility, who are not statutorily required to be bonded, and whose expenditures are not subject to public inspection and audit. Probably the real reason for the system lies in the fact that those in charge of our schools, having full confidence in their own integrity and educational skill, feel that there would be considerable difficulty in making members of the public understand the wisdom of the expenditures in question. With that position we have sympathy, but to give that plan, wise and honest as it may be, a legal status, requires a legislative enactment, for which even the best of intentions is no substitute.

Order affirmed.