## Hatfield School District Appeal

*Foulke, Foulke & Knight,* for appellants.
*High, Swartz, Flynn & Roberts,* for auditors.

CORSON, J., July 20, 1949.—This is an appeal by school board members of Hatfield Joint Consolidated School during 1944-1945, from surcharge by the school district auditors.

In the school year 1944-45 those hereinafter referred to as appellants, Willard S. Detwiler, J. Roscoe Anders, Nelson S. Hartranft, Daniel K. Ziegler, George E. Moyer, George S. Kratz, Jr., Howard Nice, Emil Berger, Alexander McArthur (since deceased), and J. Andrew West (since deceased), served on either the Hatfield Township School Board or Hatfield Borough School Board which together formed the Hatfield Joint Consolidated School Board. Appellants conducted the affairs of the school, during the fiscal period in question, in such manner that the auditors deemed them subject to surcharge for two alleged derelictions of duty: (1) The overpayment of an individual appointed to replace a teacher who became ill and subsequently resigned; and (2), a deficiency in tuition billed to nonresident pupils.

The apparent tardiness of the auditors in filing a report which the legislature prescribed in the Act of April 13, 1943, P. L. 39, sec. 2, 24 PS §2271, to be accomplished within 30 days for the preceding year, is explained by the fact that protracted litigation arose over the necessity of school directors and officers sub-

mitting the activity fund records to the auditors. The board members were ordered to submit the activity fund records for audit in Hatfield School District Auditors' Petition, 63 Montg. 25 (1946), and in Hatfield Township School District Auditors' Petition, 161 Pa. Superior Ct. 388 (1947). That the refusal to submit these records was not dilatory in nature and that their respective rights were unsettled is manifested by the fact there was such litigation and that the 1949 session of the legislature deemed it necessary to enact a law attempting to answer the questions that have arisen as to the control of activity fund records: Act of April 14, 1949, P. L. 466.

As to the first basis of surcharge, the facts are as follows: Miss Eileen Weaver had been employed to teach fourth grade in the district for the year 1944-45. Her salary was to be $1,800 for 180 teaching days, which amounts to $10 per teaching day. Shortly after the school year began Miss Weaver became ill. It was necessary for the principal, E. B. Laudenslager to procure substitutes. Several successive substitutes were obtained: Mrs. Weaver, Mrs. Clemmer, Mrs. Krupp, and Miss Betty Laudenslager. Substitutes Weaver, Clemmer, and Krupp were paid $6 per day for the days they taught, in accordance with the school board resolution of November 1, 1943, that substitute teachers be paid that amount. Apparently the regular teacher received the $4 balance of the original contracted $10 per teaching day.

Substitute Laudenslager, who was a daughter of the principal, received $10 per day for the eight days she substituted. Miss Laudenslager says that this was due to an agreement between the regular teacher, Miss Weaver, and herself, whereby Miss Weaver agreed to forego her $4. Appellants approved resulting check for $80 to Miss Laudenslager. At the meeting of appellants, on February 5, 1945, Miss Weaver's resignation

was accepted. Miss Laudenslager was appointed by them to serve as a substitute for the remainder of the year. Miss Laudenslager was paid at the rate of $10 per diem for the rest of the school year, although there was no specific authorization for such payment.

The surcharge imposed for overpayment of Miss Laudenslager from February 5th to the end of the school term cannot be sustained. Miss Laudenslager was not a "substitute" after February 5th, as that word was employed by the school board when they passed the resolution limiting pay of substitutes to $6 per day.

The legislature has distinguished between substitute and temporary professional employes, as used in the Teachers Tenure Act of April 6, 1937, P. L. 213, as amended, 24 PS §1121: Substitute . . . "any individual who has been employed to perform the duties of a regular professional employe during such period of time as the said regular professional employe is absent on sabbatical leave or for other legal cause authorized and approved by the board of school directors or to perform the duties of a temporary professional employe who is absent, or who has been employed with the approval of the district or county superintendent and of the Superintendent of Public Instruction . . . to fill a vacancy until an acceptable qualified teacher can be obtained".

On the other hand a temporary professional employe is ". . . any individual who has been employed to perform, for a limited time, the duties of a newly created position or of a regular professional employe whose services have been terminated by death, resignation, suspension or removal".

While this definition does not absolutely control the action of the school board, it does indicate crystallized thinking on the matter of those who administer the school system of the Commonwealth, the Department

of Public Instruction, and of the two lawmaking bodies. Betty Laudenslager would, in their contemplation, be clearly a temporary professional employe and not a substitute. She was employed for a limited time to perform the duties of a regular professional employe whose services were terminated by resignation.

Webster's International Dictionary indicates the meaning of the word "substitute" is to take the place of another who is absent. That seems to be the common understanding of the word. Substitute is generally employed to label the person or thing which is used to serve in the place of the permanent person or thing that is absent or unavailable for the time being. That is the concept of substitute which appellants must have had in mind when they passed the $6 a day resolution of November 1943. Hence, when the regular teacher resigned and there was a new appointment, the appointee was not to take the place of another during her absence, but to fill a vacancy left by her resignation. After February 5th, Betty Laudenslager was not just taking the place of Miss Weaver during her absence.

The reason behind the resolution may well have been legislation with regard to the Commonwealth reimbursement to school districts of a certain percentage of teachers' salaries. Reimbursement by the Commonwealth for the payment of teachers' salaries *shall not be made for substitutes*, except where a professional employe has been granted leave of absence: Act of June 20, 1939, P. L. 482, sec. 1, 24 PS §1121.

Since the school district would not receive any reimbursement for substitute's pay, it is natural that they would want to limit moneys paid to these substitutes. With the entire salary being paid out of local funds it is not improbable that an economy-minded school board would restrict the amount of salary to be paid. If this was behind the resolution of November

1943, application of the resolution would be without reason in this case, since Miss Laudenslager would be recognized by the Commonwealth as a temporary professional employe. The Act of June 20, 1939, supra, provides that the Commonwealth shall pay to the school district for each temporary professional employe the same share of salary provided by law in cases of professional employes. Furthermore, Miss Laudenslager might have been hired as a substitute by the principal, for he is empowered to obtain substitutes. However, her employment was considered by the school board. Employing teachers and filling of teacher vacancies is a matter for the board. If Miss Laudenslager was supposed to be a substitute, instead of a replacement for the rest of the year, it is strange that Principal Laudenslager did not make the appointment directly.

Community-minded members of the school district, who serve without compensation as school board members, ought not to be held personally responsible where they have acted honestly, in good faith, and have not intentionally violated school laws, or intentionally or negligently injured the district.

Surcharge for the eight-day period during which Betty Laudenslager had been hired as a substitute by the principal must be approved. The resolution, in effect, stipulated that substitutes be paid $6 per day. The resolution must be deemed controlling since it was not revoked or amended. A substitute could receive no more than $6 per day. This is so even if the regular teacher agreed not to demand the $4 to which she was entitled during the time a substitute worked in her place. Miss Weaver's willingness to forego the $4 per diem, which she received when persons other than the principal's daughter worked in her place, is of little importance. The board was bound by its resolution. Appellants were negligent in approving vouchers at a rate of $10 per day. Appellants failed to prevent loss

in their approval of the vouchers and must be held personally accountable.

The facts leading to the second surcharge are as follows: The Hatfield grade school classrooms were not completely filled with students. It was decided by appellants that obtaining tuition-paying students from other districts to fill the classrooms would be financially advantageous to the district. Certain of the fixed charges, such as janitor service, heat, light, teachers' salaries, and maintenance remain constant whether the classrooms are completely filled or not. Appellants thought that the amount of fixed charges which would have to be borne by the taxpayers would be reduced if students who pay tuition were put in the empty seats. Hence, appellants decided to encourage attendance of children from other districts. For children who resided in other districts the Hatfield schools in some cases were more accessible, and may have offered better educational facilities than the small schools of surrounding rural districts. The biggest factor was the cost. So the board set up cut-rate tuitions, graduated on the variables for the different classes. Tuition varied from $2.50 per month for first grade to $6.50 for the sixth grade. During the year 1944-45, 15 pupils attended and paid the rates charged by appellants.

The auditors insist that appellants, as a school board, had no right to set the tuition rate at other than $5.10 per month, the sum computed for Hatfield elementary grades by the Department of Public Instruction. The auditors consequently surcharged the appellants for the difference between tuition actually charged and what the district would have received if they had charged the parent of each elementary pupil $5.10.

There appears to be no statute requiring that a school district educating nonresident pupils generally must charge the parents of these children a certain tuition rate or one approved by the Department of Public

Instruction. Statutes prescribing a formula for ascertainment of tuition in certain instances do not impose upon school boards the obligation to compute in every case the tuition rate by the magic formula and to arrive at the same result as does the Department of Public Instruction.

The Act of May 1, 1925, P. L. 435, 24 PS §1480, which originally defined tuition and its computation, says that this definition refers to the use of "tuition" in article XIV of the School Code of May 18, 1911, P. L. 309, the act that establishes the public education system in Pennsylvania. Tuition is used in these sections of article XIV: Section 1404 covers the situation where a pupil lives more than one and a half miles from the district school and no transportation is provided by the district. In this situation such a pupil may attend school in another district. The district of residence will have to pay tuition to the board of the school which the pupil attends. Section 1406 uses term tuition in connection with the closing of schools and consolidation. Section 1407 provides for payment by residing district in cases of sections 1404 and 1406. Section 1412 mentions tuition in regard to orphans and children who are living in institutions located within the school district and which children are not legally residents of the district.

Section 1409 contains the only reference made in article XIV to the problems arising where a school district wishes to take in nonresident pupils, but it does not use the word tuition. Thus, the Act of 1925 and those amendments which follow it would seem not to apply. The context of section 1409 is: The board of school directors of any school district may permit nonresidents to attend their public school subject to such terms as it may determine and subject to provisions of the act.

The Department of Public Instruction's interest in setting tuition rates seems to be only where the question of reimbursement by the Commonwealth to school districts arises, or where the tuition is to be paid by the school district in which the student lives to another district where he may attend school. This is substantiated by the fact that legislation prescribing the manner of ascertaining tuition always appears to contain a limitation. The Act of 1925 says that definition refers to the use of "tuition" in article XIV of the Act of 1911. The Acts of 1945 and 1947 (which do not apply since the facts of this case occurred in 1944) prefix the language on what tuition shall be comprised of with a comment that these definitions apply for purposes of reimbursement by the Commonwealth and between school districts.

Language which was used in Harris v. Phila. Board of Education et al., 22 D. & C. 15, 17 (1934), citing Hagan Lumber Co. v. Duryea School District, 277 Pa. 345 (1923), is noteworthy in this instance:

"It may not be amiss to add that, when any action of the board of education is under attack before the courts, it is not always necessary for the board to point to a special section of the school law which authorizes specifically the particular thing that the board purposes to do or did, nor is it necessary on all occasions to justify an expenditure or a contract by any such means. So long as the act, expenditure, or contract in question is not forbidden either expressly or impliedly by the School Code, it is sufficient if the act, expenditure, or contract was done, made, or entered into for a purpose authorized either specifically or impliedly by the code."

The administrator of the estate of Andrew West, deceased, whose decedent was a member of the school board during the year 1944-45, moved to strike off the

surcharge against Andrew West. This motion was made in reliance on section 35(b) of the Fiduciaries Act of June 7, 1917, P. L. 447, as amended, 20 PS §772, which provides:

"All such rights of action which were not barred by the statutes of limitation at the time of the death of decedent may be brought against his executors or administrators at any time within one year after the death of decedent. . . ."

However, the proper construction is to consider this as an extension of the statute of limitations and not a restriction: Bank v. Dietz, Executor of Gilbert, 59 York 45 (1945). The one-year limitation, set up in section 35(b) of the Fiduciaries Act of June 7, 1917, as amended, is not a statute of limitations, but a statute enlarging existing limitations and providing that rights of action which were not barred by statutes of limitation at time of the death of decedent may be brought against his executors or administrators, at any time within one year after the death of decedent, notwithstanding the provisions of any statute of limitations whereby they would have been sooner barred.

And now, July 20, 1949, in accordance with the Act of May 18, 1911, P. L. 309, sec. 2626, as amended, 24 PS §2272, the surcharge based on ascertainment of tuition for nonresident students and for payment of salary to the teacher replacement is ordered removed. The surcharge based on salary payment for eight days to a substitute in excess of the school board resolution is sustained and judgment is entered against appellants, Willard S. Detwiler, J. Roscoe Anders, Nelson S. Hartranft, Daniel K. Ziegler, George E. Moyer, George S. Kratz, Jr., Howard Nice, Emil Berger, and the personal representatives of Alexander McArthur and J. Andrew West, in the sum of $32.